UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 09-CV-0061-CVE-FHM ) |
| GEORGE DAVID GORDON, JOSHUA WAYNE LANKFORD, and DEAN JOSEPH SHEPTYCKI, | ) ) ) ) ) ) |
| Defendants. | ) |

## OPINION AND ORDER

Now before the Court is the Motion of the United States to Intervene and for Stay of Discovery and Proceedings (Dkt. # 21) and Defendant David Gordon's Unopposed Motion for an Extension of Time to File His Answer and File Joint Status Report (Dkt. # 23). Gordon argues that the Securities and Exchange Commission (SEC) and the United States chose to commence both actions against him at the same time and should not be permitted to stay the civil case. For the reasons set forth below, the United States' motion is granted and Gordon's motion is moot.

### I.

On February 10, 2009, the SEC filed a complaint alleging that Gordon, acting in concert with named co-defendants and others, engaged in a "market manipulation scheme." Dkt. # 2, at 5. According to the SEC, Gordon and co-defendant Joshua Wayne Lankford merged operating companies into shell companies that they controlled, creating National Storm Management Group, Inc. (NLST), a Nevada corporation with its principal place of business in Glen Ellyn, Illinois, and Deep Rock Oil and Gas, Inc. (DPRK), a Nevada corporation with its principal place of business in

Tulsa, Oklahoma. Id. at 4-5. From 2005 to the present, NLST's stock has been quoted on the Pink Sheets and, until August 2006, traded under the symbol NLST. Id. at 4. NLST was created through a reverse merger with another company, The 18th Letter, Inc., and purports to be a "storm restoration firm specializing in residential home repair from the effects of wind and hail damage." Id. DPRK has also been quoted on the Pink Sheets since 2005. Id. DPRK was formed through a reverse merger with another company, Cherokee Energy Services of Tulsa, Inc., and purports to be "an oil and gas exploration and production company." Id. According to the complaint, Gordon and Lankford used fraudulent legal opinion letters in order to obtain the removal of the restrictive legends from millions of shares of NLST and DPRK stock. Id. at 5. The legal opinion letters misrepresented the identity of the owners of the shares of stock, the length of time that they had owned the stock, and the requirements for removal of the restrictive legend. Id.

The SEC alleges that, to generate trading volume history and raise the share price for DPRK, Gordon and Lankford placed matched orders. Id. Matched orders are "coordinated transaction[s], in which an order for the purchase/sale of stock is entered with the knowledge that a contra order (sale/purchase) for substantially the same quantity of shares of the same stock, at substantially the same time and price, has been or will be entered by another person, with the intent that the orders will execute against each other." Id. According to the SEC, matched orders artificially raised the market price for shares of DPRK stock. Id. at 6.

With respect to the third company alleged to have been part of Gordon's market manipulation scheme, Gordon and Lankford controlled virtually all of the unrestricted stock of Global Beverage Solutions, Inc. (GBVS), a Nevada corporation with its principal place of business in Tulsa, Oklahoma. Id. at 4, 5. From in or about 2005 through 2006, GBVS' securities were

registered with the SEC, and its shares trade on the over-the-counter bulletin board under the symbol "GBVS." Id. at 4.

The SEC alleges that Gordon and Lankford hired co-defendant Dean Joseph Sheptycki to promote the stocks of NLST, DPRK, and GBVS (collectively, the Target Stocks). Id. at 6. Sheptycki sent a mass public distribution via facsimile projecting a large price increase for the Target Stocks and recommending that the fax recipients purchase the Target Stocks. Id. Sheptycki was promised approximately 10% of the net trading proceeds. Id. According to the complaint, Gordon and Lankford also "orchestrated the promotion of the Target Stocks through the mass distribution of spam emails touting the Target Stocks to the public." Id. The spam emails, like the faxes sent by Sheptycki, projected huge price increases for the Target Stocks and recommended that the recipients of the spam emails purchase stock. Id. In addition, Gordon and Lankford are alleged to have promoted DPRK and GBVS stock by mass distributing a "Magalog" projecting large price increases and recommending that the recipients purchase the stock. Id. The SEC specifically alleges that the promotional materials for NLST and DPRK "exploited the devastating effects of Hurricanes Katrina and Rita." Id. As a result of the promotional faxes, spam emails, and Magalogs, there was an increase in trading volume and market price for the Target Stocks. Id.

The SEC alleges that Gordon and Lankford owned the majority of shares of the Target Stocks, which allowed them to control the share price and ensure that the market price remained artificially elevated. Id. at 7. Specifically, Gordon and Lankford coordinated trading to prevent too much stock from entering the market during the promotional campaign. Id. They also provided "buy-side support when there were too many other retail investors selling stock." Id. At the conclusion of the promotional campaign for the Target Stocks, the market prices dropped. Id.

According to the complaint, Gordon and his co-defendants sold NLST stock from August 2005 through October 2005, DPRK stock from August 2005 through March 2006, and GBVS stock from December 2005 through December 2006. Id. Defendants are alleged to have derived more than $20 million in illegal trading profits. Id.

On the same day that the SEC filed its complaint, a 24-count indictment was unsealed charging Gordon, Lankford, and Sheptycki, along with two others, with criminal violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78(ff); Rule 10b-5, 17 C.F.R. § 240.10b-5, which was promulgated to implement section 10(b); conspiracy to commit securities fraud, wire fraud and money laundering in violation of 18 U.S.C. § 371; numerous counts of wire fraud in violation of 18 U.S.C. § 1343; money laundering in violation of 18 U.S.C. § 1957(a); and aiding and abetting in violation of 18 U.S.C. § 2. Dkt. # 22. Gordon was also charged with making false statements in violation of 18 U.S.C. § 1001; obstruction of justice in violation of 18 U.S.C. § 1512(c)(2); and a separate wire fraud count. Id.

The United States now files this motion to intervene and stay the SEC's civil case while the criminal case against Gordon is pending. The SEC does not oppose the government's motion.

**II.**

Pursuant to Federal Rule of Civil Procedure 24(a), intervention of right shall be permitted when the applicant claims an interest relating to the subject of the action and the disposition may impair or impede his ability to protect that interest. Fed. R. Civ. P. 24(a). A court may grant permissive intervention pursuant to Rule 24(b) when "when an applicant's claim or defense and the main action have a question of law or fact in common." Fed. R. Civ. P. 24(b). When deciding whether to grant permissive intervention, a court will consider whether the intervention "will unduly

4

delay or prejudice the adjudication of the rights of the original parties." Id. The Tenth Circuit follows "a somewhat liberal line in allowing intervention." Utah Ass'n of Counties v. Clinton, 255 F.3d 1246, 1249 (10th Cir. 2001). In determining whether a motion to intervene is timely, the court considers, in light of all the circumstances, "the length of time since the applicant knew of his interest in the case, prejudice to the existing parties, prejudice to the applicant, and the existence of any unusual circumstances." Id. at 1250 (citing Sanguine, Ltd. v. United States Dep't of Interior, 736 F.2d 1416, 1418 (10th Cir. 1984)). Courts will allow the government to intervene for the purpose of obtaining a stay of civil proceedings to protect the government's interest in a parallel criminal proceeding. See SEC v. Chestman, 861 F.2d 49, 50 (2d Cir. 1988) (upholding district court's grant of permissive intervention and stay of civil proceedings pending the outcome of a criminal matter). In this case, the government meets the requirements for permissive intervention.[1] The government's motion is timely because it was filed shortly after the Court denied defendant Gordon's motion to dismiss (Dkt. # 19). Moreover, there is no apparent prejudice to the existing parties, nor are there any obviously unusual circumstances. In addition, the government has demonstrated that there are common questions of law and fact between the two proceedings. Accordingly, the Court finds that Gordon will not be prejudiced by allowing the government to intervene.

---

[1] Because permissive intervention is granted, the Court need not decide whether the government would be entitled to intervention as a matter of right pursuant to Rule 24(a).

**III.**

The government further moves to stay the civil proceeding pending the resolution of the parallel criminal case against Gordon. A district court is not generally required to stay a civil proceeding pending the outcome of a parallel criminal proceeding absent "substantial prejudice" to a party's rights. SEC v. Dresser Indus., Inc., 628 F.2d 1368, 1375 (D.C. Cir. 1980). Nonetheless, at the prosecution's request, district courts have deferred civil proceedings pending the completion of a parallel criminal case. United States v. Kordel, 397 U.S. 1, 12 n.27 (1970) (citing cases where federal courts stayed a civil case at the government's request); Kashi v. Gratsos, 790 F.2d 1050, 1057 (2d Cir. 1986) (holding that a district court may, in its discretion, stay a civil proceeding when the "interests of justice seem to require such action."). See also Landis v. N. Am. Co., 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its own docket with economy of time and effort for itself, for counsel, and for litigants."). One reason to stay a civil proceeding where there is a parallel criminal proceeding is "to prevent either party from taking advantage of broader civil discovery rights." Creative Consumer Concepts, Inc. v. Kreisler, 563 F.3d 1070, 1080 (10th Cir. 2009).

Many district courts use a six-part test to determine whether a stay is appropriate. See In re Worldcom, Inc. Securities Litigation, Nos. 02-cv-3288 and 02-cv-4816, 2002 WL 31729501, at *3-4 (S.D.N.Y. Dec. 5, 2002) (stating the factors comprising the six-part test and collecting cases where this six-part test was also used). See also In re CFS-Related Securities Fraud Litigation, 256 F. Supp.2d 1227, 1237 (N.D. Okla. 2003). The six-part test weighs the following factors: (1) the extent to which the issues in the civil and criminal cases overlap; (2) the status of the case, including whether defendant has been indicted; (3) the interests of the plaintiff in proceeding expeditiously

versus the prejudice to the plaintiff resulting from the delay; (4) the interests of, and burden on, the defendant; (5) the interests of the Court; and (6) the public's interest. In re CFS-Related Securities Fraud Litigation, 256 F. Supp.2d at 1236-37 (citations omitted).

The first factor examines the extent to which the issues in the parallel civil and criminal cases overlap. The extent of overlap is the "most important factor in ruling on a motion to stay." S.E.C. v. Nicholas, 569 F. Supp.2d 1065, 1070 (C.D. Cal. 2008) (citing Milton Pollack, Parallel Civil & Criminal Proceedings, 129 F.R.D. 201, 203 (1989)). Here, both the civil complaint and the indictment allege that Gordon and his co-defendants perpetrated a "pump and dump" scheme involving the same three Target Stocks and the same manipulative means. Both allege identical conduct in obtaining control of the Target Stocks, engaging in coordinated trading, and promoting the companies through false and misleading advertisements. The Court finds that there is a complete overlap of issues between the civil and criminal cases.

The second factor, the status of the case and whether defendant has been indicted, also weighs in favor of granting a stay because Gordon has already been indicted. However, this factor is given more weight in cases where it is defendant who seeks the stay in order to avoid choosing between his Fifth Amendment privilege against self-incrimination and his defense in the civil case. See United States ex. rel. Gonzalez v. Fresenius Medical Care North America, 571 F. Supp.2d 758, 763 (W.D. Tex. 2008) (the strongest case for a stay is where the defendant is required to defend a civil action while under indictment for a serious offense).

The third factor and sixth factors may be discussed together because the SEC is charged with enforcing the securities laws on behalf of the public. Thus, plaintiff's interest and the public's interest are intertwined in a civil enforcement action. The government represents that the SEC does

not object to a stay of the civil case. Accordingly, a stay is also in the public's interest. See Nicholas, 569 F. Supp.2d at 1071 (finding that a stay was in the public's interest, and granting the government's motion to stay where the SEC did not oppose the stay).

As to the fourth factor, defendant's interest, Gordon's primary argument against the stay is that the government and the SEC intentionally brought their cases on the same day to seek publicity, and should not be permitted to prevent Gordon from defending himself in the civil case while the criminal case proceeds. Gordon's argument is without merit. The SEC and the government act to protect the public from securities fraud and safeguard the integrity of the public markets. See Krull v. SEC, 248 F.3d 907, 915 (9th Cir. 2001) (one of the key purposes of the Securities and Exchange Act is to protection the "public interest by insuring the stability of the markets and integrity of representation by its participants."). Accordingly, it is appropriate to make the public aware of the status of its investigations by holding a press conference or issuing a press release. Gordon's argument with regard to the publicity gained by unveiling the civil and criminal cases on the same day is without merit.

Gordon also argues that preventing a defendant from taking advantage of broader civil discovery mechanisms is not a legitimate reason to grant a stay. However, many courts have granted stays to prevent a criminal defendant from obtaining otherwise unavailable information. See Nicholas, 569 F. Supp.2d at 1072 (citing cases where stays were granted for this reason).

As a general matter, Gordon fails to demonstrate how he would be harmed if the government's motion to stay is granted. Rather, it seems Gordon might stand to benefit from proceeding with the criminal case first; if the civil and criminal cases were to proceed simultaneously, Gordon's Fifth Amendment rights would undoubtedly be implicated. See id. at

1070.  In addition, Gordon would not have the distraction of defending himself in a civil action while facing serious criminal charges, nor would he be forced to decide whether to testify in his civil case or assert his Fifth Amendment right and risk having the civil fact-finders draw an adverse inference.  In fact, defendants in Gordon's position often seek to stay the civil proceeding for these very reasons.  See, e.g., Kreisler, 563 F.3d at 1080 (defendant moved to stay civil proceedings to avoid having to choose between testifying in civil case and giving up Fifth Amendment rights in criminal case).

Finally, the Court may consider its own interests in "efficient administration and judicial economy" when determining whether a stay is appropriate.  See Fresenius Medical Care North America, 571 F. Supp.2d at 765.  The government contends that the Court's interest weighs in favor of granting a stay for reasons of judicial economy.  The Court agrees.  A stay of the civil case pending the outcome of the criminal proceeding would avoid a duplication of efforts and a waste of judicial time and resources.

In sum, after considering the factors and the arguments raised by defendant, the Court concludes that, because of the overlap in factual allegations and the interests of the parties, the public, and the Court, a stay of the civil case pending the outcome of the criminal case is in the interests of justice.

**IT IS THEREFORE ORDERED** that the Motion of the United States to Intervene and for Stay of Discovery and Proceedings (Dkt. # 21) is **granted**.  The Clerk of Court is directed to add the United States of America as a party plaintiff.

**IT IS FURTHER ORDERED** that this case is hereby stayed; plaintiffs are directed to move to lift the stay within **fifteen (15) days** of completion of the criminal proceedings.


**IT IS FURTHER ORDERED** that Defendant David Gordon's Unopposed Motion for an Extension of Time to File His Answer and File Joint Status Report (Dkt. # 23) is **moot.**

**DATED** this 28th day of July, 2009.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT